UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ENBRIDGE PIPELINES (EAST TEXAS), L.P. by ENBRIDGE HOLDINGS (TEXAS SYSTEMS), L.L.C. ITS GENERAL PARTNER, <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL PAPER COMPANY, <br><br> Defendant. | § § § § § § § § § § § § § § § CIVIL ACTION NO. H-04-1017 |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. No. 56), Defendant's Motion for Partial Summary Judgment and Motion to Strike Enbridge's Seventh Affirmative Defense to International Paper Company's Counterclaim (Doc. No. 54), and Defendant's Motion to Dismiss for Failure to Properly Plead (Doc. No. 49). For the reasons set forth below, Plaintiff's motion for partial summary judgment is **DENIED**, Defendant's motion for partial summary judgment is **GRANTED**, Defendant's motion to strike is **GRANTED**, and Defendant's motion to dismiss is **GRANTED**.

## I. BACKGROUND

Plaintiff Enbridge Pipelines (East Texas) L.P. ("Enbridge") is a supplier of natural gas, and Defendant International Paper Company ("International Paper") is a manufacturer of paper products that utilizes natural gas as a source of energy in its mills. International Paper executed a contract with Koch Midstream Services Company ("Koch") on August 3, 2000, under which Koch would sell and deliver natural gas to International Paper's paper mill in Texarkana, Texas. In late 2001, Enbridge bought certain assets of Koch, including the natural gas pipeline that

served International Paper's Texarkana mill. Consequently, Enbridge became International Paper's natural gas supplier in 2002.

The contract executed on August 3, 2000, ("Base Contract") was a standard form contract created by the Gas Industry Standards Board, Inc. The Base Contract does not specify any particular amount of natural gas to be purchased, but rather allows the parties to nominate the quantities of natural gas to be delivered by the seller and taken by the buyer on a monthly basis. The advantage of this type of arrangement is that it allows one price to be set for all of the gas to be delivered in a particular month, which enables both the buyer and seller to avoid unpredictable daily fluctuations in the price of gas on the "spot market."

The Base Contract sets forth procedures for the monthly gas nominations. It requires the parties to exchange monthly "Transaction Confirmations" specifying the amount of gas per day required by the buyer, the price of the gas, and the performance obligation of the parties, either (1) firm (fixed quantity), (2) firm (variable quantity), or (3) interruptible. These three terms refer to the parties' obligations to deliver and take the quantity of natural gas nominated. An "interruptible" obligation, according to the contract, means that "either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability." (Base Contract § 2.18.) A "firm" obligation, on the other hand, means that "either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure."[1] (Base Contract § 2.15.) In other words, under a firm obligation, whether fixed or variable, the seller is required to deliver and the buyer obligated to take the quantity of gas nominated in the transaction confirmation (unless prevented by a force majeure).

---

[1] Whether a nomination is "firm (fixed quantity)" or "firm (variable quantity)" depends on the type of quantity designation. A fixed quantity is an exact quantity, such as 10,000 MMBtu per day, while a variable quantity consists of a range of quantities, such as 9,000 MMBtu minimum and 11,000 MMBtu maximum per day.

If the seller fails to deliver or the buyer fails to take the designated quantity of gas under a firm obligation, then the defaulting party is contractually required to pay "imbalance charges" and a "cover standard." Imbalance charges must be paid to the gas transporter when one of the parties fails to meet the nomination requirements, and these are to be borne by the defaulting party. (Base Contract §§ 2.17, 4.13.) Additionally, the defaulting party must also pay a cover standard charge to the non-defaulting party in order to cover the costs associated with reselling unused gas or purchasing gas that was not provided, as the case may be. (Base Contract §§ 2.9, 3.2.)

The Base Contract between International Paper and Koch that was executed in August 2000 put in place the framework for natural gas transactions, but it did not obligate International Paper to purchase natural gas from Koch each month. In fact, International Paper did not purchase gas from Koch for the next several months. International Paper alleges that in an effort to obtain its business, a representative of Koch, Curtis Day, told the mill's energy buyer, Steve Abramowitz, that if International Paper purchased gas from Koch, Koch would charge it only for the amount of gas that was burned, rather than the amount nominated. International Paper claims that it was this representation that caused it to begin purchasing natural gas from Koch in December 2000. Enbridge denies that any Koch or Enbridge representative ever made such a statement.

Nevertheless, it is undisputed that from January 2001 through March 2002, International Paper purchased and Koch (and subsequently Enbridge) delivered natural gas to the Texarkana paper mill without incident. Each month, rather than filling out a written Transaction Confirmation, the parties confirmed their monthly gas nominations telephonically,[2] and Enbridge

---

[2] The Base Contract sets forth the procedure for exchanging Transaction Confirmations each month. Enbridge and International Paper chose to utilize a written transaction procedure, but amended the default provisions of that

3

sent invoices to International Paper for the amount of gas that it burned. On at least one occasion during that period, the amount of gas that International Paper consumed in a month deviated from the amount of gas that it nominated, but Enbridge did not assess an imbalance charge or cover standard charge.

In March 2002, several months after Enbridge purchased the mill's natural gas pipeline from Koch, Enbridge and International Paper held a meeting to reaffirm their business relationship. International Paper alleges that at this meeting, Curtis Day, now Enbridge's representative, told International Paper once again that it would be charged only for the quantity of gas that it burned, with no imbalance charge or cover standard. Enbridge again denies that such a statement was ever made.

After this meeting, International Paper hired a new energy buyer for the mill, Tom Eustace. Mr. Eustace claims that, for the remainder of 2002, as a result of the understanding between Enbridge and International Paper, he ceased telephoning Enbridge each month to make a nomination of gas usage, and Enbridge simply continued to bill International Paper only for the amount of gas that it burned each month.

However, relations between Enbridge and International Paper began to sour in February 2003. Near the end of January 2003, the price of natural gas began to fluctuate wildly and eventually closed at $5.385 per MMBtu[3] at the end of the month. In order to lock in a fixed price, International Paper made a nomination for the month of February 2003 of 11,000 MMBtu of gas per day at a price of $5.435 per MMBtu. Then, however, on February 14, 2003, International Paper modified its nomination, informing Enbridge that it would be taking only 5500 MMBtu of gas daily. Consequently, Enbridge sold the excess gas, but International Paper

---

procedure to allow for it to be done by "facsimile, or any mutually agreeable means." The parties' unfaltering practice was to confirm monthly gas nominations telephonically.

[3] "MMBtu" represents "millions of British thermal units," the unit of measurement for heat energy.

4

then continued to pull gas from Enbridge in amounts significantly exceeding 5500 MMBtu per day. The price Enbridge had to pay to obtain additional gas to provide to International Paper rose to $19.130 per MMBtu.

As a result of the rising gas prices, for the month of March 2003, International Paper nominated 14,000 MMBtu of gas per day at a price of $8.790. However, during this month, the daily gas prices began to plummet, falling as far as $4.870. International Paper then began to pull an average of only 7357 MMBtu of gas per day from Enbridge, and to purchase gas from another supplier on the spot market at a lower price. Enbridge was again forced to sell the unused portion of gas, this time at a substantial loss.

Around this same time, Enbridge undertook a "pigging" operation of its gas pipelines located within thirty-eight miles of International Paper's Texarkana mill. Pigging consists of sending an electronic device through pipelines to clear obstructions and collect data. Enbridge informed International Paper that it would be conducting the pigging operation in January or early February 2003. Subsequently, Enbridge discovered that it needed to remove some debris in its pipeline, so on February 20-21, 2003, Enbridge poured 100 barrels of solvent into its pipeline to dissolve the debris. Part of the solvent made its way into International Paper's mill, clogged some filters for the mill's power boilers, and consequently shut down the power boilers—and the mill's operations—for a portion of the day.

As a result of this combination of incidents, relations between Enbridge and International Paper became strained. The parties participated in a conference call on March 20, 2003, to discuss matters, but the meeting was unproductive. The following day, Enbridge decided to bill International Paper for a cover standard charge totaling $582,268.59 for its failure to meet the March gas nomination. Then, on March 26, 2003, Enbridge sent International Paper an amended

invoice for February 2003 that also included a cover standard charge totaling $206,781.83 for International Paper's over-usage in that month.  In retroactively imposing this cover standard charge, Enbridge relied on a provision of the Base Contract providing that "[a]ll invoices and billings shall be conclusively presumed final and accurate unless objected to in writing with adequate explanation and/or documentation, within two years after the Month of gas delivery."  (Base Contract § 7.4.)

International Paper refused to pay the cover standard charges, so Enbridge filed suit, alleging (1) breach of contract, (2) common law fraud, (3) conversion, (4) violations of the Texas Theft Liability Act, (5) unjust enrichment, (6) quantum meruit, (7) promissory estoppel, and (8) negligent misrepresentation.  International Paper filed several counterclaims against Enbridge, including (1) negligence (with regard to the pigging operation), (2) common law fraud, and (3) breach of contract.  The parties have now moved for summary judgment on nearly all of these claims.  In addition, International Paper has moved to dismiss Enbridge's common law fraud claim for failure to properly plead.  Finally, International Paper has asked that Enbridge's affirmative defense to the negligence counterclaim be stricken.

## II. MOTION TO DISMISS

International Paper moves for dismissal of Enbridge's common law fraud claim for failure properly to plead. Federal Rule of Civil Procedure 9(b) requires certain claims, including fraud, to be pled "with particularity."  The Fifth Circuit has held that "[p]leading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'"  *Williams v. WMX Tech, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) (citing *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994).  The plaintiff is required to specify

6

what statements it contends are fraudulent, identify the speaker, state when and where the statements were made, and explain precisely why the statements were fraudulent. *Williams*, 112 F.3d at 177.

Enbridge states its account of International Paper's alleged fraud in its First Amended Complaint as follows:

> International Paper would from time to time nominate the amount of gas it would need for an upcoming period of time. This nomination would set the contract quantity of gas to be delivered and taken by the purchaser for the period covered by the nomination. . . .
>
> . . . International Paper breached the contract by either not taking the amount of gas it had nominated, or by taking in excess of the gas it had nominated and refusing to pay Enbridge the imbalance and cover amounts set forth in the Base contract. For instance in February of 2003, International Paper nominated 11,000 MMBtu. On February 14, 2003 International Paper communicated to Enbridge that it wanted to change its nomination down to 5500 MMBtu a day. Enbridge, relying on that nomination and confirmation, sold the position on the remaining 5500 MMBtu purchased to meet International Paper's nomination. However, International Paper continued to pull up to 11000 MMBtu through February in contradiction of the confirmed nomination of February 14, 2003 causing Enbridge to sustain a loss in the amount of at least $213,454.39.
>
> In March of 2003, International Paper nominated 14000 MMBtu per day but used only 7357 MMBtu a day. This failure of International Paper to take the gas nominated forced Enbridge to sell this unused portion of gas to a third party. . . .

(Pl.'s First Am. Compl. 3-4.) Nowhere in these paragraphs does Enbridge identify the speaker of the alleged misrepresentations, state where the statements were made, nor explain why the statements were fraudulent at the time they were made. Enbridge has expanded on its allegations in its response to International Paper's motion to dismiss, but such additional explanations do not cure the defect of the First Amended Complaint.

7

Enbridge also argues that the purpose of Rule 9(b) is simply to put a defendant on notice of a plaintiff's claims, and that International Paper is certainly on notice of the particulars of its fraud claim after all of the discovery that has been conducted in this case. Any actual notice, however, does not excuse Enbridge's failure to provide that notice in its complaint, as required by Rule 9(b). Thus, because Enbridge failed to plead its fraud claim with the requisite particularity, International Paper's motion to dismiss the fraud claim is **GRANTED**.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255.

#### B. Enbridge's Breach of Contract Claim

Enbridge has moved for summary judgment on its breach of contract claim against International Paper. It argues that the Base Contract clearly provides for cover standard charges to be imposed when a buyer takes more or less gas than its monthly nomination, and that

International Paper undisputedly took more or less gas than it nominated on several occasions. Thus, Enbridge argues, International Paper is contractually required to pay the cover standard charges, but has refused to do so.

The Court begins by noting that the parties do not dispute that they are bound by a valid contract. And while it is true that the Base Contract contemplates a cover standard charge, the relevant provision of the Contract says that the charge is to be imposed "in the event of a breach of *a Firm obligation*." (Base Contract § 3.2) (emphasis added). But the Base Contract does not mandate that every natural gas sale be made under a firm performance obligation. In fact, the paragraph of the Base Contract addressing performance obligation provides that "[s]ales and purchases will be on a Firm or Interruptible basis, as specified in the Transaction Confirmation." (Base Contract § 3.1.) Yet in the present case, there is no written Transaction Confirmation for the months of February or March 2003, or apparently for any prior month. The parties' practice was to make their monthly gas nominations and confirmations by telephone, so there is no written record of which performance obligation the parties chose. The contract between Enbridge and International Paper is therefore missing a term.

The Uniform Commercial Code as adopted by Texas permits any contract term, including a missing one, to be explained or supplemented by parol or extrinsic evidence, as long as that evidence does not contradict any of the other written terms of the agreement. Tex. Bus. & Com. Code Ann. § 2.202 (Vernon 1994); *De La Morena v. Ingenieria E Maquinaria De Guadalupe, S.A.*, 56 S.W.3d 652, 657-58 (Tex. App.—Waco 2001, no pet.); *Magnolia Warehouse & Storage Co. v. Davis & Blackwell*, 195 S.W. 184, 185 (Tex. 1917) ("if the written instrument itself shows to be either ambiguous or incomplete, parol testimony is admissible to show what the real

contract was"). Such parol or extrinsic evidence should take the form of course of performance, course of dealing, or usage of trade evidence. Tex. Bus. & Com. Code Ann. § 2.02(a).

In this case, then, because the contract between Enbridge and International Paper is incomplete, the parties must produce evidence of course of performance, course of dealing, or usage of trade to establish which performance obligation was contemplated by the parties. International Paper argues that Enbridge billed it only for the gas it burned for a period of over two years, and that such a course of dealing indicates that the parties intended an interruptible obligation. Enbridge, on the other hand, contends that it operated under the assumption that the contract imposed a firm obligation. This dispute reflects an issue of material fact that cannot be decided on summary judgment. Thus, Enbridge's motion for partial summary judgment on its breach of contract claim must be **DENIED**.

If, at trial, the finder of fact determines that the parties were operating under a firm obligation, then International Paper will still have available to it the supplemental defense that the cover standard provision of the Base Contract was orally modified, modified by course of dealing, waived, or estopped. The parol evidence rule does not bar testimony or evidence of subsequent modifications made to the written agreement. *See Quitta v. Fossati*, 808 S.W.2d 636, 642 (Tex. App.—Corpus Christi 1991, writ denied).

Finally, the Court notes Enbridge's objection to the length of International Paper's response brief on this issue, which exceeded this Court's page limitation by fifty-seven pages without leave. The objection is well-taken, and the Court reminds the parties that the rules exist for a purpose, in this case to promote clarity and conciseness. Still, because the Court is generally reluctant to penalize a client for the mistake of counsel, Enbridge's objection is **OVERRULED**.

### C. Enbridge's Conversion and Negligent Misrepresentation Claims

International Paper has moved for summary judgment on Enbridge's tort claims, conversion and negligent misrepresentation, citing the "independent injury rule." Under Texas law, when the only loss or damage is to the subject matter of the contract between the parties, the appropriate method of recovery is generally on the contract, rather than in tort. *S.W. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). Here, Enbridge alleges that International Paper is liable for conversion for taking more natural gas than it nominated, and that it is liable for negligent misrepresentation in connection with its monthly gas nominations. The injury to Enbridge in both instances relates to its delivery and sale of natural gas, which is the subject of the contract between the parties. Thus, because Enbridge's only loss is the subject matter of the contract, its method of recovery must be on the contract. International Paper's motion for summary judgment on Enbridge's tort claims of conversion and negligent misrepresentation is therefore **GRANTED**.

### D. Enbridge's Quantum Meruit, Unjust Enrichment, and Promissory Estoppel Claims

International Paper has also moved for summary judgment on Enbridge's claims of quantum meruit, unjust enrichment, and promissory estoppel. All of these claims are quasi-contract in nature, which are appropriate when there is no express contract between the parties. In this case, however, neither party disputes the existence of an express contract between Enbridge and International Paper. Thus, Enbridge will not be able to recover in quasi-contract. International Paper's motion for summary judgment on these claims is therefore **GRANTED**.

### F. International Paper's Negligence Claim

Enbridge has moved for summary judgment on International Paper's counterclaim for negligence. This counterclaim arises out of Enbridge's alleged negligence in connection with the

11

pigging operation of February 2003 that resulted in a temporary shut-down of the Texarkana mill. International Paper is seeking damages for, *inter alia*, overtime costs, downtime costs, lost profits, and costs for substitute sources of power. Enbridge argues that recovery of such damages is precluded by the terms of the Base Contract, and therefore International Paper's negligence counterclaim cannot survive summary judgment.

The Base Contract provides, "Except as otherwise specifically provided herein, in no event will either party be liable *under this contract*, whether in contract, in tort (including negligence and strict liability), or otherwise, for incidental, consequential, special, or punitive damages." (Base Contract § 3.2) (emphasis added). While this clause does indeed bar claims for some types of damages, it does so only for claims arising "under this contract." There is no mention of pigging in the Base Contract, so the Court is persuaded that any alleged negligence stemming from the pigging operation gives rise to an independent tort. Because the claim does not arise under the Base Contract, International Paper is not precluded from pursuing the damages it seeks on its counterclaim for negligence. Thus, Enbridge's motion for summary judgment on this counterclaim is **DENIED**.

### H. International Paper's Common Law Fraud Claim

Enbridge also moves for summary judgment on International Paper's counterclaim for common law fraud. International Paper alleges that Curtis Day, a representative of Enbridge, fraudulently told International Paper on at least two occasions that Enbridge would bill it only for the gas that it burned, without imposing any cover standard charges.

Enbridge argues that it cannot be liable for fraudulent inducement to enter a contract because the Base Contract warrants that it "sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and

12

representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective Transaction Confirmation(s)." (Base Contract § 13.4.) However, International Paper does not appear to be making a claim for fraudulent inducement because the statements allegedly made by Curtis Day were made after the Base Contract was executed in August 2000.

As to the common law fraud claim, Enbridge argues that even if Curtis Day made the statements that International Paper alleges, those statements were merely his opinion as to the effect of a legal document, the Base Contract, and are therefore not actionable as fraud. While it is true that a representation as to the effect of a legal document is generally regarded as a statement of opinion rather than of fact and will not ordinarily support an action for fraud, *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987), the Court disagrees with such a characterization of Mr. Day's alleged statements. His alleged statements were about how Enbridge would conduct business with International Paper in the future, not about the legal effect of the Base Contract. Thus, Enbridge's motion for summary judgment on International Paper's counterclaim for fraud is **DENIED**.

## IV. MOTION TO STRIKE AFFIRMATIVE DEFENSE

Finally, International Paper has moved to strike one of Enbridge's affirmative defenses. Enbridge asserted assumption of risk as an affirmative defense to its alleged negligence in connection with the pigging operation. Enbridge argues that Federal Rule of Civil Procedure 8(c) permits a party to plead assumption of risk as an affirmative defense. International Paper points out, however, that the Texas Supreme Court has abolished assumption of risk as an affirmative defense in negligence cases and held that the issue is subsumed within the contributory negligence determination. *See Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758

(Tex. 1975). Since this is an action brought under Texas law, this Court must follow the directive of the Texas Supreme Court and strike Enbridge's affirmative defense of assumption of risk. International Paper's motion to strike is **GRANTED**.

## V. CONCLUSION

Defendant's Motion to Dismiss for Failure to Properly Plead (Doc. No. 49) is **GRANTED**. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 56) is **DENIED**. Defendant's Motion for Partial Summary Judgment (Doc. No. 54) is **GRANTED**. Finally, Defendant's Motion to Strike Enbridge's Seventh Affirmative Defense (Doc. No. 54) is **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** this 22nd day of January, 2007.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT**